**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-490-01** |
| **CHRISTINA O. WILLIAMS** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Christina Williams conspired to launder millions of dollars of funds stolen from local government entities through business email compromise, as well as money the United States government had set aside to help small businesses that were struggling for survival during the COVID-19 pandemic. Over the course of more than one year, she opened bank accounts for a phony business, conducted hundreds of bogus transactions designed to deceive others and to conceal the illegal source, and helped to put some of the stolen money back into the hands of those running the illegal operation. Williams knew the funds were dirty and were not earned by her non-existent business. She is college-educated, had a full-time, stable job at the time and did not commit this crime out of necessity. She committed the crime out of greed. While she was committing the crime and spending proceeds on herself, she had multiple plastic surgeries, bought a luxury car, and purchased a home. She profited handsomely from her crime.

The defendant's participation was essential to the criminal conspiracy. The scheme could not have succeeded to the extent that it did without her willingness, and the willingness of others like her, to move the money around in order to conceal its unlawful source, its location, and the identity of the person who was directing its movement. For these reasons, as well as for the reasons provided below and in the sealed supplement to this memorandum, the government recommends a sentence within the Sentencing Guidelines range of 57 to 71 months of incarceration.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025). At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory Guidelines range and of the Section 3553(a) factors.

## I. <u>BACKGROUND</u>

Williams was first approached by federal investigators in this case in May 2023. She acknowledged that her mother, Rosemarie Dixon, had told her that investigators had spoken to Dixon a few days prior. Despite being advised multiple times that lying to federal law enforcement agents was a crime, Williams lied to the agents again and again. She claimed she did have a legitimate real estate business, which was not true. She identified a fake person named "Wanda" who was supposedly the source of the funds that were deposited into Williams' business bank

accounts, and she falsely claimed that she did not keep any of the money for herself. *See* Attachment A, FD-302 of Williams interview on May 12, 2023 (filed under seal). Despite consenting to interviews after May 2023 and fully knowing that she had serious criminal exposure, the defendant continued to maintain regular contact with the person orchestrating the ongoing conspiracy, referred to here as "Person 1." Presentence Report ("PSR") ¶ 30 (the defendant's relationship continued for four years, until 2024).

On November 13, 2025, a federal grand jury returned a 21-count indictment charging Christina Williams and her mother, Rosemarie Dixon, with one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(h), and twenty counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), arising from their involvement in a large-scale conspiracy to launder the proceeds of a wire fraud scheme. Williams was charged in Count One, the conspiracy count, as well as Counts Two through Eight, which were substantive counts of money laundering.

On May 19, 2026, pursuant to the terms of a written guilty plea agreement, the defendant pled guilty to Count One of the indictment, which charged her with conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). During her guilty plea colloquy, the defendant admitted that from approximately January 2020 through April 2021, she conspired with Person 1, as well as her mother, Rosemarie Dixon, and other individuals, to participate in a money laundering conspiracy to conduct and attempt to conduct financial transactions affecting interstate commerce, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity and which, in fact, involved the proceeds of wire fraud, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds.

While she was participating in this criminal conspiracy, Williams held a full-time job with a highly regarded hospital system in Philadelphia. PSR ¶ 90. Despite being gainfully employed, the defendant seized on the opportunity to work with Person 1 and others for her own benefit. She kept for herself a substantial portion of the funds that she laundered through her accounts at the request of Person 1.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

The total maximum sentence for Count One (money laundering conspiracy in violation of 18 U.S.C. § 1956(h)) is 20 years of imprisonment, three years of supervised release, a fine of up to twice the value of the funds involved, and a $100 special assessment. Full restitution shall be ordered. Forfeiture may also be ordered.[1]

### B. Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory Guidelines range in the revised final PSR issued on August 26, 2026. This calculation is as follows:

| | |
|---|---|
| Base offense level (§ 2S1.1, § 2B1.1(b)(1)(J)): | 26 |
| Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)): | +2 |
| Sophisticated laundering (§ 2S1.1(b)(3)): | +2 |
| Zero-point offender (§ 4C1.1): | -2 |
| Acceptance of responsibility (§ 3E1.1): | -3 |
| **Total offense level:** | **25** |

The defendant has not objected to the calculation set forth above. The defendant has a criminal history score of zero. Accordingly, the Guidelines range is 57 to 71 months of incarceration.

[1] In a separate motion, the government is seeking a forfeiture money judgment in the amount of $970,376.36, which is the amount of the dirty money that the defendant kept for herself, spent herself, and converted to untraceable cash. The defendant agreed to forfeit this amount in her guilty plea agreement.

## III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id*. at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the Guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A. Consideration of the 3553(a) Factors Regarding Imprisonment

Williams actively worked with her mother, Person 1, and others in a large, sophisticated, lucrative criminal conspiracy. Crimes committed through conspiracy are more significant than crimes committed by a single individual because, through the coordinated conduct of many participants, the conspiracy is capable of being more profitable, more difficult to detect, and harder to terminate.

The conspiracy that the defendant participated in was a textbook example of such a conspiracy. Certain actors conducted research on the victims, their employees, and their victims' vendors, and then they committed the cybercrime of submitting fraudulent loan applications and stealing funds from businesses and local government entities through business email compromise ("BEC") fraud. These actors were separate from those like the defendant who participated in moving stolen funds around once received, so the cyber actors were able to concentrate continuously on stealing.

While that was occurring, Person 1 recruited willing participants like the defendant to open numerous bank accounts in the names of bogus businesses in order to receive the stolen victim funds. Williams herself went to four separate financial institutions and opened numerous bank accounts in the names of a fake real estate business so that the accounts could be used for these crimes.

As soon as the victim funds arrived in the conspirators' accounts, Person 1 and others coordinated with the defendant and other launderers to conduct immediate transfers of that money in ways designed to avoid detection, tracing, and freezing. Specifically, the participants broke up the stolen funds into smaller transaction amounts, caused conspirators to send funds in multiple directions and in multiple layers (for example, to other conspirators and to their own accounts at

other banks, and then back again in different amounts), and converted the stolen funds into cash and other difficult-to-trace financial instruments, such as cashier's checks. Defendant Williams conducted over 100 ATM and cash withdrawals, over 100 debit purchases, over 50 peer-to-peer transactions, and wrote more than a dozen checks using funds in the accounts into which the stolen funds were deposited. She made purchases at cell phone stores, a luxury car dealership, bars and lounges, a casino, restaurants, and retail stores.

Because Person 1 had recruited multiple participants like the defendant, and each participant, like the defendant, had opened accounts at multiple banks, the web of transactions was complex. If a launderer had one account frozen by a bank due to suspected fraud, that person had many other accounts that could spring into action so that the person could continue to aid the conspirators. No one launderer held all of the stolen funds at once, so if the banks closed all of the accounts held by one launderer, the laundering conspiracy could continue to operate through others.

The government submits that in this case, a period of incarceration is necessary to provide just punishment for the defendant. While the Court indicated its discomfort with punishment for punishment sake at a prior sentencing for one of the defendant's co-conspirators, providing just punishment is one of the goals of sentencing. 18 U.S.C. § 3553(a)(2)(A). Williams' crime caused significant harm to local government entity victims and the United States government and siphoned money away from the small businesses which were legitimately qualified for pandemic loans. It succeeded on a large scale because it was organized, roles were compartmentalized, and people like the defendant were willing to risk conducting laundering transactions in their own names in order to make quick and easy money. The defendant laundered over $7 million that was stolen from victims over more than a one-year period, committed the crime as an adult and out of

greed, profited and enriched herself with a luxury car and a new home for herself and her co-conspirator mother, PSR ¶ 95, and partied and got plastic surgery in Miami more than once, PSR ¶ 76. One of those surgeries occurred in August 2020 in the middle of the COVID-19 pandemic, when many businesses were shut down and people avoided unnecessary travel and medical procedures. *Id.* In such circumstances, it would shock most members of the public to learn that the defendant was not sentenced to some amount of incarceration.

These types of schemes are an epidemic in the United States and cannot succeed without people like the defendant laundering the funds. According to the 2026 INTERPOL Global Financial Fraud Threat Assessment, financial fraud is among the top five global crime threats, has caused a steady increase in fraud loss in the United States from $4 billion in 2020 to $16.6 billion in 2024, and is expected to escalate significantly in the next three to five years.[2] Financial frauds can destroy businesses and steal significant resources from governmental entities. *See*, *e.g.*, *United States v. Carver*, 916 F.3d 398, 404 (4th Cir. 2019) ("Financial fraud is a modern scourge. It preys especially upon the unsophisticated and vulnerable" and "harm[s] victims in almost irreparable ways by causing them loss of work, mental anguish, monetary loss, and loss of peace of mind.").

Despite the vigilance of victims and financial institutions, crimes like the defendant's are extraordinarily hard to detect, stop, and investigate. Often it is the victims who trigger an investigation. In a case like this one, a BEC victim may learn from the legitimate vendor it believed it was paying that, in fact, no payment had been received for weeks or months. By that time, the victim has often unwittingly sent significant amounts of money to the criminals. Only if the victim acts extremely quickly can it manage to reverse a payment. If the victim is delayed more than a

[2] The report is available at: https://www.interpol.int/News-and-Events/News/2026/INTERPOL-report-warns-of-increasingly-sophisticated-global-financial-fraud-threat.

day or two, conspirators like the defendant have moved the stolen funds from the destination account to other accounts and placed them out of reach. Similarly, where the stolen funds are from pandemic loans in the names of an existing business which did not know about or authorize its name to be used, like occurred in this case, the first the government-as-victim learns of the crime is when the real business that was impersonated receives notices of overdue loan payments for the loans in its name and contacts the Small Business Administration. That process can take weeks or months, and by then, conspirators like the defendant have moved the stolen funds several layers beyond the original destination account.

Financial institutions also monitor transactions for money laundering activity like that committed by defendant Williams. Despite Anti-Money Laundering regulations and compliance programs, however, only a small fraction of money laundering is detected. *See* Why AML Compliance Programs Fail — And How to Fix Them (updated June 25, 2026), at https://www.flagright.com/post/what-causes-an-aml-compliance-program-to-fail (estimating that over 99% of global money laundering goes undetected).

Investigating crimes like the defendant's pose many challenges. There are many small transactions to follow, multiple launderers to identify and locate, and in order to show that there was no legitimate business reason for transactions, it is necessary to prove a negative – that a business like the defendant's supposed real estate business did not exist and did not operate.

Because crimes like Williams' are proliferating and causing significant damage to American victims, and because these crimes are difficult to catch and to prove, this crime calls for a sentence that reflects its seriousness and to promote respect for the law.

The fact that the defendant does not have a prior criminal history does not weigh in favor of a downward variance. This fact is accounted for in the Guidelines range because she is in the

lowest criminal history category also received the two-level reduction in her offense level for being a zero-point offender.

As noted above, the crime the defendant committed was one of greed and opportunity. She committed it over more than a one-year period, and it involved reasonably significant premeditation. For those reasons, there is a risk of recidivism and a need for the sentence in this case to send a message of deterrence to this defendant.[3]

While the defendant now claims that Person 1 was verbally abusive throughout their relationship and psychologically abusive once at the end, any such conduct cannot absolve the defendant of guilt or excuse away her criminal conduct. The defendant was an independent, college-educated adult, fully employed, and she chose to continue her participation in the crime because of the party lifestyle that it afforded.

In addition to sending a message of deterrence to defendant Williams, there is also a need for this sentence to send a message of general deterrence to those who might be tempted to do the same. It is important to send a message that people who steal and launder money will face serious consequences. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotations omitted). The recommended sentence of incarceration affords adequate deterrence to others who

[3] It should be noted that as the Probation Officer was gathering financial records in the normal course of preparing the PSR, she observed that the defendant had claimed significant medical deductions on numerous recent tax returns. When the defendant was questioned by the Officer, she had no explanation other than to point to a tax preparer, who she said was also unable to explain the deductions. Draft PSR ¶ 22. Additionally, the defendant claimed tens of thousands of dollars in losses on her 2022 return for a "home health aid consultant" business that remains unexplained, as the only employment the defendant disclosed to the Probation Officer for 2022 was full-time employment at a Philadelphia hospital system. PSR ¶ 90.

would commit a similar offense and protects the public from further crimes of the defendant, for at least as long as she remains incarcerated.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." U.S.S.G. § 3553(a)(2)(D).

The government must acknowledge that, against the requests of the government, this Court has granted substantial downward variances for other conspirators that have come before the Court for sentencing in this sophisticated money laundering conspiracy. The following chart shows the case caption and number, final Guideline offense level and criminal history, final Guideline range, sentence imposed by this Court, and the percentage reduction from the bottom of the Guideline range represented by the final sentence:

| **Caption and number** | **Offense level - criminal history category** | **USSG range** | **Sentence** | **Percent reduction from bottom of USSG range** |
|---|---|---|---|---|
| U.S. v. Carine 25-CR-39 | 23-I | 46-57 mo. | 24 mo. incarceration | 48% |
| U.S. v. McCrea 25-CR-387 | 19-I | 30-37 mo. | 5 years probation | 100% |
| U.S. v. Dunston 25-CR-248 | 21-I | 37-46 mo. | 5 years probation | 100% |
| U.S. v. R. Dixon 25-CR-490-02 | 25-I | 57-71 mo. | 5 years probation | 100% |
| U.S. v. J. Dixon 25-CR-489 | 19-I | 30-37 mo. | 5 years probation | 100% |

In each instance, the government argued in favor of a sentence within the advisory Guideline range.

At several of the most recent sentencing hearings, the Court has cited the sentences it handed down to the other conspirators as weighing heavily in favor of another non-custodial sentence, to avoid disparities.[4]

The government urges the Court to reconsider the weight it gives to that one narrow aspect of disparity – the sentences this Court has imposed for members of this specific conspiracy -- and is asking the Court to rebalance its disparity analysis to achieve an outcome which also avoids sentencing disparities nationwide. One of the major and laudable goals of Congress when it enacted the Sentencing Reform Act of 1984, which led to the creation of the United States Sentencing Commission, was to eliminate widespread, unpredictable differences in how individual federal judges sentenced people convicted of the same crimes. *See About the United States Sentencing Commission*, available at https://www.ussc.gov/about. While the Guidelines are advisory, not binding, they remain a significant factor in the federal sentencing process, and the goal of avoiding significant differences in how individual judges handle matters involving the same offense remains important. It is appropriate to recalibrate the disparities issue in this particular case because Williams has the highest offense level of any conspirator sentenced to date, besides her mother. Williams' mother had the same offense level because they conspired together and laundered funds back-and-forth with one another. However, Williams got involved in the offense several months before her mother, establishing her phony real estate business and opening

[4] The Court has repeatedly distinguished defendant Carine's case from the others and indicated it is not comparable when the Court is considering disparities in sentencing the co-conspirators, apparently solely because defendant Carine had a security clearance when he committed his offense. The government maintains that that fact alone should not put him in a separate category altogether.

bank accounts in the name of that fake business long before Dixon. Williams was also more supportive of Person 1, even renting an apartment in her name for his use. PSR ¶ 57.

United States Sentencing Commission data shows that there were 173 defendants sentenced nationwide in the last five years under Guideline section 2S1.1, the same applied for Williams' crime. Excluding those who received a government motion, the overwhelming majority, 97%, received a sentence of imprisonment. For those sentenced to imprisonment, the average length of the term was 45 months, and the median was 48 months. For all 173 defendants, the average period of incarceration was 43 months, and the median was 46 months.[5] A sentence of probation for defendant Williams would be an extreme outlier among those nationwide statistics, and, in the government's view, in light of all of the considerations of sentencing, not an appropriate sentence for this defendant.

Adherence to the recommended Guidelines range assures that the defendant's sentence is consistent with those imposed nationwide for similarly situated offenders and thus complies with Section 3553(a)(6) and avoids undue disparity with cases nationwide. The Guidelines represent the distillation of more than 20 years of careful study of sentencing practices across the country and correlate as well to the varying severity of crimes as defined by Congress. Indeed, "the Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands

[5] Of the 204 defendants sentenced in the last five under § 2S1.1 with the same offense level and criminal history category as Carine, 90% received a sentence of incarceration, and of those the average length was 34 months, and the median length was 36 months of imprisonment. Of the 174 defendants sentenced in the last five under § 2S1.1 with the same offense level and criminal history category as Dunston, 89% received a sentence of incarceration, and of those the average and median length was 25 months. Of the 164 defendants sentenced in the last five years under § 2S1.1 with the same offense level and criminal history category as McCrea and J. Dixon, 85% received a sentence of imprisonment, and of those the average length was 22 months, and the median length was 24 months.

of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Here, the properly calculated Guidelines range accurately accounts for the financial harm and sophistication of the scheme while also taking into account the defendant's acceptance and lack of criminal history. A sentence within the Guidelines range will avoid unwarranted disparities with similarly situated defendants nationwide who have committed similar crimes.

People who perpetrate financial crimes, especially highly organized and sophisticated financial crimes such as those at issue here, do pay attention to enforcement actions and trends. According to the 2026 INTERPOL Global Financial Fraud Threat Assessment, criminal networks are cooperating globally, sharing expertise, and adapting their illicit business models to optimize efficiency, "including through collaboration with specialized money laundering networks," and the offenders are "highly organized, skilled and agile." INTERPOL Report at 6.

Even those who are not in the top, organizational positions in a conspiracy like this one pay attention to the consequences of getting caught. They learn from their friends and family in their neighborhoods and social networks when someone who has committed a multi-million-dollar crime and got caught, was sentenced only to probation. Stories like that cause people not to hesitate to recruit their friends and family, such as the defendants in this case, to participate in economic crime with them. In the face of the epidemic of financial crimes nationwide and internationally, the government asks the Court to consider its deterrence message in fashioning the appropriate sentence in this case.

During sentencing hearings of co-conspirators, the Court indicated that it believes no one is paying attention to cases like these, leading it to conclude that general deterrence is not a

consideration in this case. It is not the case that no one is paying attention to business email compromise cases and the financial fallout that occurs when people like the defendant put the stolen funds out of reach. For example, WECT News in Wilmington, North Carolina, reported on the massive financial fallout to one of the local government victims from the BEC fraud involved in this case. *See* "Brunswick County loses $4 million in email phishing scheme," Mar. 9, 2022, at https://www.wect.com/2022/03/09/brunswick-county-loses-4-million-e-mail-phishing-scheme/. For local government entities like those victimized here, the media, taxpayers, vendors, and employees must all pay attention because of the cascading negative impact of millions of dollars of losses. *See* "Town Sends 15% of Annual Budget to Cybercriminals," Aug. 26, 2021, at https://www.secureworld.io/industry-news/peterborough-cyber-attack.

At the same time, defendant Williams has not presented a persuasive case for leniency and has not expressed any remorse for her crimes.

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a within-Guidelines sentence. As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case.

**B. <u>Supervised Release</u>**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further,

Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The Guidelines commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of three years is warranted. As noted above, it is the government's position that the defendant presents a risk of recidivism, as the opportunity and temptation to commit a similar crime may present itself in the future. Supervision after incarceration will advance the goals of deterring criminal conduct, § 3553(a)(2)(B), protecting the public, § 3553(a)(2)(C), assuring that the defendant continues to pursue efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to her victims, § 3553(a)(7).

For these reasons, the government recommends a term of supervised release of three years and imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV. CONCLUSION

Unless otherwise presented at the defendant's sentencing hearing and stated in the sealed attachment to this memorandum, the government believes that a sentence within the advisory

Guidelines range of 57 to 71 months of incarceration and a three-year term of supervised release is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*s/ Nancy E. Potts*
NANCY E. POTTS
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was filed electronically and was served by electronic mail upon:

Louis T. Savino, Jr., Esq.
Louis T. Savino and Associates
Two Penn Center
15th and John F. Kennedy Blvd., Suite 1516
Philadelphia, PA 19102
Louistsavino@yahoo.com
Counsel for Defendant Christina O. Williams

Date: October 7, 2026

*s/ Nancy E. Potts*
NANCY E. POTTS